# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-00905-SCT

*W. W. WARREN*

*v.*

*ROBERT DERIVAUX*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/02/2007 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | ROY H. LIDDELL |
| | CLINT D. VANDERVER |
| | BEVERLY D. POOLE |
| ATTORNEYS FOR APPELLEE: | STEPHEN J. CARMODY |
| | JONATHAN R. WERNE |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | ON DIRECT APPEAL:  AFFIRMED.  ON CROSS-APPEAL:  REVERSED AND RENDERED - 12/04/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., DICKINSON AND LAMAR, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     This case arises from a dispute between adjoining commercial landowners, W. W. Warren and Robert Derivaux, and concerns the rights created by a document entitled "Reciprocal Easement," executed in 1986 by Warren and the predecessor owner to the Derivaux property, Ronald C. Smith.  The pivotal question is whether the Reciprocal Easement establishes a perpetual easement for parking and signage in addition to the easement for ingress and egress.  Second, this Court must determine whether Warren's

conduct warranted compensatory damages for lost profits, punitive damages, and an award of attorneys' fees.

## FACTS AND PROCEDURAL HISTORY

¶2.     Warren and Derivaux own adjoining commercial property in Jackson, Mississippi, near the southwest corner of Interstate 55 and Northside Drive. Warren's property is to the immediate north of Derivaux's property.

¶3.     In 1986, the Mississippi Department of Transportation updated the frontage road that runs along the east property line of both parties. Because Warren's property lost all access to the frontage road from his property, Warren negotiated for an access easement across the property of Ronald C. Smith, predecessor owner of Robert Derivaux's property. In return, Smith sought rights as to parking and signage. On April 22, 1986, Warren and Smith executed a document entitled "Reciprocal Easement," drafted by Warren's attorney and filed with the Hinds County Chancery Clerk. The Reciprocal Easement states, in part, that Smith and Warren "do hereby sell, convey and vest in each other, their successors in title, perpetual easement rights, to wit:

    (1)    The period, duration or term of this easement shall be perpetual, and/or until eternity.

    (2)    Parcel #2 - Easement. This description shall be used for only ingress and egress purposes, and for no other reasons. Said description in Parcel #2 - Easement shall never be blocked to impair it's [sic] continuous use for ingress-egress by all parties lawfully upon the lands, Parcel #1 - Fee, and W. W. Warren property lying to the North, as shown by the plat attached. Said Parcel #2 - Easement shall be kept "clear" at all times.

(3)    As to property presently or hereafter owned by W. W. Warren, lying North and adjacent as to Parcel #1 - Fee or Ron C. Smith, it is agreed that parties with business interest may cross-park in four spaces owned by W. W. Warren located South of Bennigan's; furthermore, that parties with business interest may cross-park in four spaces owned by Ron C. Smith, a part of Parcel #1- Fee.

(4)    Business Sign. W. W. Warren vests in Ron C. Smith the legal right to erect, maintain, and remove upon the property of W. W. Warren which lies 1.5 feet from said Ron C. Smith, North Property line, and 35 feet Westward from the Southeast Corner of the W. W. Warren property, a business sign as mutually agreed upon."

¶4.    Pursuant to these terms, Smith erected a business sign within 1.5 feet of his north property line and 33 feet from the southeast corner of Warren's property. The sign was approved by Bennigan's management[1], per Warren's instructions, and stood until 1988, when Derivaux purchased Smith's property in foreclosure. Having been informed of the Reciprocal Easement, Derivaux removed Smith's sign and erected a new sign for his insurance business. Warren and Derivaux discussed the new sign with Warren approving.[2] Derivaux's sign was located in approximately the same location as Smith's sign.

¶5.    From 1988 until April 2002, Derivaux, his employees, and his customers used four parking spaces located on the Warren property. In 1998, Warren informed Derivaux that the sign could not remain in its location unless Derivaux paid rent. No further action was taken by either party until April 2002, when Warren demanded monthly payment for parking. Upon

---

[1] At the time of the erection of the sign, Bennigan's Restaurant was the tenant on Warren's property.

[2] Warren requested that Derivaux obtain approval of the sign from Bennigan's management. The manager of Bennigan's approved the sign and its location.

this demand, Derivaux made one payment in the amount of $250, but ceased payments after consulting his attorney. Derivaux continued to use the four parking spaces. On May 31, 2005, Warren disconnected the power to Derivaux's sign. Derivaux gave Warren a copy of the Easement and demanded that Warren cease tampering with the sign. On June 4, 2005, Warren, his son, and a welder removed Derivaux's sign by the use of a blow torch and damaged the sign in the process. Warren also placed concrete parking bumpers in the parking lot, restricting Derivaux's access to the spaces nearest the property line.

¶6.     On June 28, 2005, Derivaux filed suit against Warren in the County Court of Hinds County, First Judicial District, seeking compensatory and punitive damages, along with injunctive relief. The county court issued a temporary restraining order on June 29, 2005, ordering Warren to remove the parking bumpers. In response, Warren rearranged the barriers and installed a wooden fence near the property line. The fence was actually located, as Warren's own expert confirmed, on Derivaux's property.

¶7.     The county court held that the Reciprocal Easement granted Derivaux and his successors the right to use four parking spaces for business purposes without restriction as well as the right to erect and maintain a sign within the designated area. The court further found that Warren's actions were malicious and/or grossly negligent, warranting an award of punitive damages. The county court awarded punitive damages and attorneys' fees, in addition to compensatory damages for the cost of a new sign and for loss of profits. The county court also granted Derivaux and his successors a permanent injunction preventing any interference with their rights under the Reciprocal Easement.

4

¶8.     Warren appealed the ruling to the Chancery Court of Hinds County. The chancery court affirmed the county court's ruling as to the easement and damages for lost profits, but reversed the award of punitive damages and attorneys' fees. The chancery court found that the Reciprocal Easement, which included rights as to access, parking, and signage, was "a valid and enforceable easement that runs with the land." In reversing punitive damages, the chancery court found that Warren's conduct alone, while evidencing his anger, was not sufficient to warrant punitive damages, considering the totality of the circumstances. The chancery court reversed the award of attorneys' fees, finding "if attorneys' fees are not authorized by the contract or by statute, they are not to be awarded when an award of punitive damages is not proper."

¶9.     Warren now appeals to this Court, arguing that the chancery court erred in finding that Derivaux has a valid and enforceable easement for parking and signage. Warren also appeals the award of damages for lost profits. Derivaux cross-appeals, arguing that the chancery court erred in reversing the county court's award of punitive damages and attorneys' fees.

**STANDARD OF REVIEW**

¶10.    The judgment of a county court in a nonjury trial is entitled to the same deference on appeal as a chancery-court decree, as to its findings of fact and conclusions of law. ***Patel v. Telerent Leasing Corp.***, 574 So. 2d 3, 6 (Miss. 1990) (citing ***Rives v. Peterson***, 493 So. 2d 316, 317 (Miss. 1986)). When reviewing the findings of fact of a chancellor, this Court applies the "manifest error/substantial evidence rule." ***Miss. State Tax Comm'n v. Oscar E. Austin Trust***, 719 So. 2d 1172, 1173 (Miss. 1998). This Court is prohibited from disturbing

5

the findings of the chancellor unless they are "manifestly wrong or clearly erroneous." ***Bowers Window & Door Co. v. Dearman***, 549 So. 2d 1309, 1312-13 (Miss. 1989). This Court, however, reviews issues of law under a de novo standard, and will reverse if the law has been applied or interpreted erroneously. ***Miss. Transp. Comm'n v. Fires***, 693 So. 2d 917, 920 (Miss. 1997).

ANALYSIS

**I. Direct Appeal**

**A. Whether the parties created a perpetual easement for parking and signage.**

¶11.    The first issue raised by Warren is whether the trial court erred in finding that the Reciprocal Easement created a perpetual easement as to parking and signage. Warren argues that the parties intended to create, and the document created, a single easement for ingress and egress and mere privileges as to the parking and signage.

¶12.    In order to determine what the parties intended, this Court must first examine the language contained in the 'four corners' of the instrument. ***Pursue Energy Corp. v. Perkins***, 558 So. 2d 349, 351 (Miss. 1990) (citing ***Pfisterer v. Noble & Cities Serv. Oil Co.***, 320 So. 2d 383, 384 (Miss. 1975)).    In reviewing the document, the court should construe the language in a manner "which makes sense to an intelligent layman familiar only with the basics of English language." ***Pursue,*** 558 So. 2d at 352 (citing ***Thornhill v. Sys. Fuel, Inc.***, 523 So. 2d 983, 1007 (Miss. 1988)).

¶13.    In looking at the Reciprocal Easement on its face, it must be noted that the document itself is entitled "Reciprocal *Easement*" (emphasis added).  The name of the document alone

would suggest a *quid pro quo* – one easement being exchanged for another. On its face, the document does not mention the words "license" or "privilege."[3] The Reciprocal Easement states that Smith and Warren "do hereby sell, convey, and vest in each other, their successors in title, perpetual easement rights . . . . " A semi-colon follows this statement, followed by one paragraph for each of the access easement, the cross-parking, and the business sign. It would follow to an intelligent layman that the "perpetual easement rights" would apply to each paragraph thereafter, noting especially that no qualification is made that the parking and signage provisions are not, in fact, easements.

¶14.   If the intent of the parties is not yet ascertained after "four corners" analysis, the court will employ any applicable canons of contract construction. One such canon of contract construction enumerated by this Court is that "great weight should be given to practical construction which the parties have placed upon the instrument." ***Pursue,*** 558 So. 2d at 353 (citing **St. Regis Paper Co. v. Floyd**, 238 So. 2d 740, 744 (Miss. 1970)). The facts here indicate that both parties believed that parking and signage were part of the perpetual easement until Warren changed his mind in 1998. When Derivaux purchased the property and decided to put up his own sign, he sought the approval of Warren, who deferred to Bennigan's management. The actions taken at that time by both parties indicate that they

---

[3]Paragraph 5 of the Reciprocal Easement states "Property as described by plat attached dated April 14, 1986, Alderman Engineering Company, shall likewise be the beneficiary of all rights and privileges herein created." This use of "privilege" merely states that the rights under the document will pass to the owners' beneficiaries. This use of "privilege," therefore, furthers Derivaux's argument, not Warren's.

both believed the rights under the easement were perpetual, running with Derivaux's property. In addition, Warren did not take any action to show that he believed otherwise until 1998, when he first demanded that Derivaux either take the sign down or pay rent.

¶15. Warren also argues that the Reciprocal Easement lacks the specific description required for a valid easement. Any description of an easement needs "accuracy and clarity." *Moran v. Sims*, 873 So. 2d 1067, 1070 (Miss. Ct. App. 2004). The Reciprocal Easement specifically describes the access easement, with reference to an attached plat map. The document also provides for a business sign which may be located "1.5 feet from said Ron C. Smith, North property line, and 35 feet Westward from the Southeast Corner of the W. W. Warren property." The Reciprocal Easement's description of both the access and signage areas certainly is sufficient to establish an easement, as it provides accuracy and clarity as to the location.

¶16. The Reciprocal Easement's description of the parking spaces does not on its face provide accuracy and clarity. The document provides that "parties with business interests may cross-park in four spaces owned by W. W. Warren located South of Bennigan's," although neither the document nor the plat map explicitly identifies four distinct parking spaces. This Court has stated, however, that "[w]hen the grant is ambiguous the construction given by the parties themselves, as proved by the manner in which they exercise their rights under the conveyance, is legal evidence." *Capital Elec. Power Ass'n v. Hinson*, 84 So. 2d 409, 412 (Miss. 1956) (citing Thompson on Real Property Vol. 2 § 581, 188-189)). In *Hinson*, this Court held that "[t]he general rule is that where the grant is in general terms, the

8

exercise of the right, with the acquiescence of both parties, in a particular course or manner, fixes the right and limits it to the particular course or manner in which it has been enjoyed." *Id.* at 413. "This rule applies not alone to the location of the easement, but also to the extent thereof . . . it applies to the course, manner, extent, and length." *Id.*

¶17. The Reciprocal Easement is, as Warren argues, ambiguous as to the parking spaces. Any ambiguity, however, should be construed against the drafting party. *Id.* at 413. It is undisputed that Warren's attorney drafted the Reciprocal Easement. Because Warren, as the drafting party, did not designate the location of the easement, Smith and Derivaux were free to select a suitable location, taking into account the interest of Warren, per the rule in *Hinson*. Derivaux, and presumably Smith before him, used the four parking spaces nearest his own office, at the extreme south end of Warren's property. Any objection by Warren to the parking spaces selected by Smith and Derivaux should have been made within a reasonable time. Because Warren did not object, the location of the four spaces was determined by the "exercise of the right" by Derivaux, with Warren's acquiescence.

¶18. For the foregoing reasons, this Court finds that the county court did not err in finding that the document created a perpetual easement as to both parking and signage. Further, this Court finds that the terms of the Reciprocal Easement, along with the exercise of the right by Derivaux, fixed the location of the parking spaces as the four located nearest Derivaux's property. This Court therefore affirms the ruling of the chancery court, which found a perpetual easement as to access, parking spaces, and signage.

**B. Whether the court erred in awarding damages for lost profits.**

9

¶19. Warren argues that the chancery court erred in affirming an award of lost-profits damages to Derivaux, asserting that no evidence in the record demonstrates that Warren's removal of the sign was causally related to Derivaux's lost income. Warren also argues that Derivaux's testimony was not supported by the best evidence or adequate documentation.

¶20. A party seeking recovery for lost profits must establish the claim with reasonable certainty, not based on mere speculation and conjecture. *Lovett v. E.L. Garner, Inc.*, 511 So. 2d 1346, 1353 (Miss. 1987); *Ishee v. People's Bank*, 737 So. 2d 1011, 1013 (Miss. Ct. App. 1998). Damages are deemed speculative only when the cause is uncertain, not when the amount is uncertain. *Parker Tractor & Implement Co. v. Johnson*, 819 So. 2d 1234, 1239 (Miss. 2002). "Where it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages." *Cain v. Mid-South Pump Co.*, 458 So. 2d 1048, 1050 (Miss. 1984). When loss is realized, but "the extent of the injury and the amount of damage are not capable of exact and accurate proof," damages may be awarded if the evidence lays "a foundation which will enable the trier of fact *to make a fair and reasonable estimate* of the amount of damage." *Id.* at 1050. This Court has recognized past earnings as a sufficient method to estimate lost profits. *Ishee,* 737 So. 2d at 1013 (citing *Kaiser Inv., Inc. v. Linn Agriprises, Inc.*, 538 So. 2d 409, 416 (Miss. 1989); *Sanders v. Dantzler*, 375 So. 2d 774, 777 (Miss. 1979)).

¶21. The trial court awarded Derivaux $14,580 in compensatory damages for loss of income, along with $1,350 for each month until Warren removed the fence.

10

¶22.    Derivaux's evidence supporting an award of damages for lost profits is comprised of calculations based on production reports for the years 2003, 2004, 2005, and 2006. Warren removed Derivaux's sign on June 4, 2005. Derivaux therefore claims that his lost profits should be calculated as the average number of new policies sold per month during 2004 less the same average during 2006. Derivaux estimated that he lost an average of twenty-seven new policies per month after the sign was removed and parking was blocked. Derivaux provided average gross-and net-income values for policies sold. Derivaux also attributed some loss of business to Warren's harassment of customers and employees. He testified that one of his employees quit because of Warren's continued harassment.

¶23.    Derivaux should not be precluded from recovery, so long as "he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss." *Cain*, 458 So. 2d at 1050. "Extrapolating actual past profits to reach a figure that represent[s] anticipated future profits [is] a reasonably certain method of proving lost profits." ***Benchmark Health Care Ctr., Inc., v. Cain***, 912 So. 2d 175, 180 (Miss. Ct. App. 2005).

¶24.    Because documentation of the calculation and the testimony of Derivaux himself were presented at trial, the court was presented with ample evidence upon which to estimate lost profits to a reasonable certainty, and this Court should not disturb the decision of the trial court. The award of damages for lost profits is therefore affirmed.

**II. Cross-Appeal**

**Whether the chancery court erred in reversing the award of punitive damages and attorneys' fees.**

11

¶25.   "The award of punitive damages, along with the amount of such, are within the discretion of the trier of fact." *Hurst v. SW Miss. Legal Servs. Corp.*, 708 So. 2d 1347, 1350 (Miss. 1998).  This Court has "shown great deference to [triers of fact] that have awarded punitive damages."  *Am. Income Life Ins. Co. v. Hollins*, 830 So. 2d 1230, 1242 (Miss. 2002).  Awards of punitive damages will not be disturbed absent exceptional circumstances, such as where the amount is arbitrary or unreasonable, against the overwhelming weight of the evidence, or shows passion, bias, or prejudice so as to shock the conscience of the court. *Id*.[4]

¶26.   The county court awarded punitive damages [5] and attorneys' fees to Derivaux, finding that Warren's actions toward Derivaux and Derivaux's property were malicious or grossly negligent enough to warrant punitive damages for the "reprehensible conduct."  The chancery court reversed this award, and Derivaux now appeals.  The chancery court held that " . . . Warren's conduct in and of itself" does not justify a punitive-damages award.  Derivaux asserts that the county court's award of punitive damages was supported by substantial evidence and should not have been reversed by the chancery court.  Mississippi Code Annotated Section 11-1-65(1)(a) allows for punitive damages where a plaintiff shows by clear and convincing evidence that the defendant "acted with actual malice, gross negligence

---

[4]*See also* **Andrew Jackson Life Ins. Co. v. Williams**, 566 So. 2d 1172 (Miss. 1990); **Bankers Life & Cas. Co. v. Crenshaw**, 483 So. 2d 254, 278 (Miss. 1986); **Commodore Corp. v. Bailey**, 393 So. 2d 467, 472 (Miss. 1981).

[5]Derivaux was awarded $5,000 in punitive damages.

which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11-1-65(1)(a) (Rev. 2002).

¶27. "Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and are allowed 'with caution and within narrow limits.'" *Life & Cas. Ins. Co. of Tenn. v. Bristow*, 529 So. 2d 620, 622 (quoting *Standard Life Ins. Co. v. Veal*, 354 So. 2d 239, 247 (Miss. 1978)). Punitive damages should be awarded in addition to actual or compensatory damages where "the violation of a right or the actual damages sustained, import insult, fraud, or oppression and not merely injuries, but injuries inflicted in the spirit of wanton disregard for the rights of others . . . . [In other words, there must be] some element of aggression or some coloring of insult, malice or gross negligence, evincing ruthless disregard for the rights of others, so as to take the case out of the ordinary rule." *Bradfield v. Schwartz*, 936 So. 2d 931, 936 (Miss. 2006).

¶28. Courts have applied the same rules to easement grants as to contracts. *Tubb v. Monroe County Elec. Power Ass'n*, 912 So. 2d 192, 197 (Miss. Ct. App. 2005). This Court has held that "[p]unitive damages are recoverable in breach of contract cases where the breach results from an intentional wrong and when there has been a showing of malice or gross/reckless disregard for the rights of others." *Paracelsus Health Care Corp. v. Willard*, 754 So. 2d 437, 442 (Miss. 1999) (citing *Am. Funeral Assurance Co. v. Hubb*, 700 So. 2d 283, 285 (Miss. 1997)). "Punitive damages are only appropriate in the most egregious cases so as to discourage similar conduct and should only be awarded in cases where the actions

13

are extreme." *Paracelsus*, 754 So. 2d at 442 (citing *Wirtz v. Switzer*, 586 So. 2d 775, 783 (Miss. 1991)).

¶29. The county court judge found that Warren's actions toward Derivaux and his property "were malicious in most instances or were possibly only grossly negligent in some instances, but in any event, the Plaintiff is entitled to punitive damages in addition to his actual damages for the Defendant's reprehensible conduct." Sitting as the trier of fact, the county court found that in 2002, Warren restricted access to the parking spaces and demanded payment. In 2005, Warren disconnected the power to Derivaux's sign, despite being presented with the Reciprocal Easement by Derivaux and over Derivaux's demands to cease tampering. On that day, Warren cursed at Derivaux. A few days later, Warren tore the sign down with the help of a blow torch, damaging the sign in the process. Warren also placed parking bumpers in the parking lot to restrict Derivaux's access. Despite Derivaux's requests, Warren refused to remove the bumpers, and did so only after an order from the county court. Warren then erected a fence, despite warnings from Derivaux's attorney that the fence would create a hazard and might violate the court order. The fence erected by Warren was actually on Derivaux's property, confirmed at trial by Warren's own expert witness. Evidence was also presented showing that Warren had harassed and intimidated Derivaux's employees and customers on numerous occasions.

¶30. On appeal, the chancery court was "not convinced that Warren's conduct in and of itself justifies a punitive damages award." The chancery court did not find Derivaux's testimony regarding Warren's harrassment to be sufficient. In addition, the court noted that

14

Warren's removal of Derivaux's sign did not pose any safety hazards or cause any injuries to Derivaux, his employees or customers. Considering the totality of the circumstances, the chancery court found that "Warren's actions standing alone cannot support an award of punitive damages."

¶31. The decision of the finder of fact, the county court, should not be disturbed absent exceptional circumstances. *Hollins,* 830 So. 2d at 1242. We cannot say that the award of punitive damages was arbitrary or unreasonable or against the overwhelming weight of the evidence. Further, the award does not evidence passion, bias, or prejudice. Accordingly, this Court finds that the chancery court erred in reversing the award of punitive damages.

¶32. This Court further finds that attorneys' fees are proper in this case, as punitive damages were properly awarded by the county court. "[A]bsent statutory authority or contractual provisions, attorneys' fees cannot be awarded unless punitive damages are also proper." *Smith v. Dorsey*, 599 So. 2d 529, 550 (Miss. 1992). As discussed *supra*, the county court was presented with sufficient evidence to award punitive damages, and therefore, the chancery court erred in reversing the award.

**CONCLUSION**

¶33. On direct appeal, this Court affirms the chancery court's finding that the Reciprocal Easement created one perpetual easement as to access, parking, and signage. Also on direct appeal, this Court holds that the chancery court did not err in awarding damages to Derivaux for lost profits. On cross-appeal, this Court reverses the chancery court's determination that the county court erred in awarding punitive damages and attorneys' fees to Derivaux; this

15

Court therefore renders judgment consistent with the findings of the county court as to punitive damages and attorneys' fees.

¶34.    **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: REVERSED AND RENDERED.**

**SMITH, C.J., WALLER AND DIAZ, P.JJ., EASLEY, CARLSON, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR.**